**John W. BULL, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 01–56 C.**

United States Court of Federal Claims.

May 2, 2005.

David L. Kern, El Paso, TX, for plaintiffs. Mark L. Greenwald, San Antonio, TX, of counsel.

Christian J. Moran, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant. Robert Humphries and Christopher J. Duncan, Department of Homeland Security, United States Customs and Border Protection, El Paso, TX, of counsel.

Larry J. Adkins, Deputy General Counsel, National Treasury Employees Union, Washington, DC, amicus curiae. Gregory O'Duden, Timothy B. Hannapel, and Irene N. Pantelis, of counsel.

*OPINION*

HEWITT, Judge.

Before the court is the parties' briefing addressing the effect, if any, of the 1996 National Agreement, the collective bargaining agreement between the National Treasury Employees Union and the United States Customs Service, on plaintiffs' claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219 (2000). At the request of the court, the National Treasury Employees Union also filed briefing as amicus curiae. For the following reasons, the court finds that the statutory rights plaintiffs have asserted in this action were not waived by the parties' collective bargaining agreement.

## I. Background

Plaintiffs in this action are approximately sixty canine enforcement officers (CEOs) now employed by the United States Department of Homeland Security, Customs and Border Protection (Customs or the agency). Plaintiffs seek unpaid overtime pay under the FLSA for off-duty work allegedly suffered or permitted to be performed.[1] Plaintiffs' Second Amended Complaint (Compl. or complaint) at ¶¶ II–X.

In accordance with the court's Pretrial Scheduling Order of November 16, 2004 scheduling trial in this matter for May 3–10, 2005, the parties filed their Memoranda of Contentions of Fact and Law. In Defendant's Memorandum of Fact and Law, filed on April 6, 2005, defendant argued, for the first time, that "[w]hatever right canine enforcement officers possessed to receive overtime compensation pursuant to the FLSA ... [had been] surrendered ... in their collective bargaining agreement." *Id.* at 8. The court directed the parties to file briefing "address[ing] how the collective bargaining agreement executed on behalf of plaintiffs affects plaintiffs' ability to pursue their claims under the Fair Labor Standards Act." Order of April 14, 2005. After discussing the issue during the pretrial conference, the court directed the parties to file additional briefing before trial. *See* Transcript of Pretrial Conference on April 20, 2005(Tr.) at 34:20–25. The court also invited the National Treasury Employees Union to file briefing, as amicus curiae, based on the assistance provided to the court in earlier briefing and the very compressed briefing schedule on this subject. *See id.* at 34:25–35:3.

The court now addresses the legal effect, if any, of the collective bargaining agreement on the parties' ability to pursue their FLSA claims in this action.[2]

## II. Discussion

On October 3, 1996 the National Treasury Employees Union (NTEU)[3] and the United States Customs Service entered into a collective bargaining agreement (National Agreement), captioned "National Agreement." *See* Appendix to Defendant's Brief Regarding Collective Bargaining Agreement (Def.'s CBA Br.App.) at 1.[4] Although portions of the National Agreement were revised on March 31, 2000, *id.* at 3, the provisions at issue in this dispute were not revised. *See* Tr. at 30:16–23 (exchange between defendant's counsel and court regarding revisions to the National Agreement after 1996).[5]

1. The off-duty work for which plaintiffs seek compensation includes: (1) "time worked ... transport[ing] and laundering ... training towels during off duty time;" (2) "time worked ... caring for and training drug sniffing dogs during off duty time;" (3) "time worked ... transport[ing], buying and/or acquiring ... the necessary building materials and time spent building the necessary training aids required to be used for training drug sniffing dogs during off duty time;" (4) "time worked ... cleaning and maint[aining] ... weapons and in weapons training during off duty time;" (5) "time worked ... while engaged in training in the Academy;" and (6) "time worked ... without compensation while 'off-the-clock.'" Compl. ¶ XI.

2. The parties' briefing includes: Plaintiffs' Briefing on the Non–Effect of the Collective Bargaining Agreement (Pls.' CBA Br.); Defendant's Brief Regarding Collective Bargaining Agreement (Def.'s CBA Br.); Plaintiffs' Second Brief Concerning the Non–Effect of the Collective Bargaining Agreement (Pls.' Supp. CBA Br.); Defendant's Supplemental Brief Regarding Collective Bargaining Agreement (Def.'s Supp. CBA Br.); Brief of Amicus Curiae National Treasury Employees Union on the Effect of the Collective Bargaining Agreement (NTEU CBA Br.); Plaintiffs' Reply to Defendant's Supplemental Brief Regarding the Collective Bargaining Agreement (Pls.' Reply CBA Br.); Defendant's Reply Brief Regarding Collective Bargaining Agreement (Def.'s Reply CBA Br.); and Reply Brief of Amicus Curiae National Treasury Employees Union on the Effect of the Collective Bargaining Agreement (NTEU Reply CBA Br.)

3. NTEU "is a federal sector labor organization that is the exclusive bargaining representative of approximately 150,000 federal employees. [It] is the exclusive bargaining representative of approximately 14,600 employees of the Bureau of Customs and Border Protection, who were formerly employed by the U.S. Customs Service, including former Customs canine enforcement officers." NTEU CBA Br. at 2.

4. Because defendant provided a complete copy of the National Agreement, the court cites to defendant's appendix.

5. During the pretrial conference, counsel for defendant stated that the copy of the National Agreement provided to the court "reflect[ed] some changes in 2003[] ... [which were]

At the center of the parties' dispute about the effect of the National Agreement, if any, on plaintiffs' right to pursue their FLSA claims in this action is the interpretation of Section 15 of Article 22 of the National Agreement. Article 22 of the National Agreement addresses "Overtime." Section 15, titled "Other," states, in whole,

> Employees who are classified non-exempt under the Fair Labor Standards Act may not perform work outside normal working hours unless specifically ordered or authorized by the Employer to do so.

Def.'s CBA Br.App. at 206 (Art. 22, § 15 of the National Agreement). The parties emphasize several other provisions which have apparent relevance as well.

Defendant points to language in the National Agreement governing Customs' obligation to compensate employees for "assigned overtime." That obligation is set forth in Sections 1 and 15 of Article 22 of the National Agreement. Def.'s CBA Br. at 2–3. Section 1 provides, in pertinent part:

> When assigned overtime, employees working such overtime will be compensated in accordance with applicable laws and regulations.
>
> When determined to be necessary by the Employer, overtime will be assigned by the Employer, in accordance with law and the National Inspectional Assignment Policy (NIAP).

Def.'s CBA Br.App. at 203 (Art. 22, § 1 of the National Agreement). Construing this provision together with Section 15 of Article 22 of the National Agreement, defendant argues that "[t]he proper interpretation of the [National Agreement] is that Customs has agreed to pay overtime compensation *only* when a supervisor officially assigns a[CEO] to work overtime." Def.'s CBA Br. at 3. Defendant contends that Section 15 of Article 22 of the National Agreement "effectively waives the right of non-exempt employees to seek compensation for performing activities

outside of normal duty hours when Customs merely 'suffer[ed] or permit[ted]' those activities." Def.'s Supp. CBA Br. at 3 (alterations in original).

Defendant argues that "[a] [u]nion [r]epresenting [f]ederal [e]mployees [m]ay [w]aive [t]he [r]ights [g]ranted [b]y [t]he FLSA [t]o [i]ts [m]embers." Def.'s Supp. CBA Br. at 2; *see also* Def.'s Reply CBA Br. at 4 (arguing that "unions may release substantive rights granted to employees pursuant to the FLSA"). Relying on *O'Connor v. United States*, 308 F.3d 1233 (Fed.Cir.2002), defendant asserts that "[t]he Court of Appeals for the Federal Circuit has determined that entities that bargain collectively for Federal employees possess the authority to waive FLSA rights for its members." Def.'s Supp. CBA Br. at 2; *see also* Def.'s Reply CBA Br. at 3 (asserting that "[t]he Federal Circuit determined that the agreement between the Government and the union was valid"). Defendant contends that *O'Connor* is "binding" precedent that "resolves any question about the authority of [a] union representing Federal employees." Def.'s Supp. CBA Br. at 2. Urging the court to disregard cases involving private sector employers, defendant states that *"O'Connor* reiterates the well-established principle that cases from the private sector do not control Federal employment." Def.'s Reply CBA Br. at 5.

Plaintiffs' interpretation of Section 15 of Article 22 relies on Article 31 of the National Agreement, titled "Dispute Resolution Procedure." Def.'s CBA Br.App. at 263 (Art. 31 of the National Agreement). Plaintiffs point out that "one of the areas expressly carved out of the coverage of the [National Agreement's] Dispute Resolution Procedure is 'disputes over the application and/or interpretation of the Fair Labor Standards Act.'" Pls.' CBA Br. at 4[6] (quoting Art. 31, § 4.A(12) of the National Agreement). Section 1 of Article 31 provides that "complaints and dissatis-

---

marked by arrows." Tr. at 30:21–22. The National Agreement, however, contains a document titled, "Memorandum of Understanding," stating that the March 31, 2000 revisions to Articles 12, 13, 18, 36, and 41 are "marked by arrows." Def.'s CBA Br.App. at 3. The subjects of those articles are not in dispute in this action.

6. The pages of plaintiffs' brief are not numbered. The court cites to the pages in plaintiffs' brief as if they were conventionally numbered.

factions, which might develop into disputes, should be raised in a timely manner and resolved at the lowest administrative level on an informal basis where possible." Def.'s CBA Br.App. at 263 (Art. 31, § 1 of the National Agreement). Section 4.A of Article 31 identifies twelve subjects that are "specifically excluded from the coverage of [the dispute resolution] Article." *Id.* at 264–65 (Art. 31, § 4.A of the National Agreement). As plaintiffs point out in their briefing, among the excluded subjects are "disputes over the application and/or interpretation of the Fair Labor Standards Act." *Id.* at 265 (Art. 31, § 4.A(12) of the National Agreement); *see* Pls.' CBA Br. at 4 (quoting same). Plaintiffs argue that "[i]t is apparent ... from the [National Agreement] itself[ ] that the FLSA could apply to wage and hour claims brought by members, and the remedies [for] those types of claims would be in the judicial process, not the grievance process." Pls.' CBA Br. at 4.

Plaintiffs assert that, because Article 31 of "the [National Agreement] expressly carves out any FLSA claim asserted by a union member from any administrative remedy available under" the dispute resolution procedure, Pls.' Supp. CBA Br. at 3, their "individual substantive rights [under the FLSA] have an independent existence outside the corners of the collective agreement." *Id.* at 7; *see also id.* at 6 (citing *Curtis v. United States,* 59 Fed.Cl. 543, 549 (2004)) (stating that "without an administrative resolution, [the plaintiff-federal employees] are not protected by their CBA and must rely on the protections afforded by statute"). Plaintiffs contend that their rights "cannot be waived by the union because they exist outside of the union's power to waive them." *Id.* at 7.

NTEU argues that the language in the parties' National Agreement cannot be construed to waive employees' rights to FLSA overtime pay in the circumstances of this case because to do so would be in conflict with law, regulations, binding and persuasive precedents and public policy. *See* NTEU CBA Br. at 7–11 (discussing, *inter alia, Barrentine v. Arkansas–Best Freight Sys.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) and *Wineman v. Durkee Lakes Hunting & Fishing Club, Inc.,* 352 F.Supp.2d 815 (E.D.Mich.2005)); NTEU Reply CBA Br. at 2 (arguing that the CBA may not "supersede[ ] the FLSA, thereby eliminating or reducing the plaintiffs' entitlement to 'suffered or permitted' overtime pay ... because parties to a CBA cannot prospectively waive employment rights to FSLA overtime pay"); *see also Barrentine,* 450 U.S. at 740, 101 S.Ct. 1437 ("FLSA rights cannot be abridged by contract or otherwise because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate."); *Brooklyn Sav. Bank,* 324 U.S. at 704–711, 65 S.Ct. 895 (holding that rights to compensatory liquidated damages may not be waived by individual employees); *Wineman,* 352 F.Supp.2d at 823 ("In light of the clear policy announced by the venerable Supreme Court decisions on the subject, this Court cannot enforce the contract term shortening the period of limitations with respect to the FLSA claims in this case because it violates public policy.").

NTEU asserts that "[a] CBA cannot waive an employee's individual employment rights established by statute." NTEU CBA Br. at 4. NTEU argues that the regulations promulgated by the Office of Personnel Management (OPM) "implementing Congress[ ]' 1974 extension of the FLSA to federal employees,[7] ... confirm[ ] that *all* work that is suffered or permitted by an employer is compensable under the FLSA." *Id.* at 6–7 (citing 5 C.F.R. § 551.401(a)(2) (2005)) (footnote and footnote number altered).[8] NTEU contends that, due

---

**7.** In accordance with the Fair Labor Standards Act Amendments of 1974, Pub.L. No. 93–259, 88 Stat. 60 (1974), OPM's Director "is authorized to administer" the regulations governing fair labor standards "with respect to any individual employed by the United States." 29 U.S.C. § 204(f).

**8.** Section 551.401 of OPM's FLSA regulations is titled, "Basic Principles." 5 C.F.R. § 551.401 (2005). It provides, in pertinent part:

(a) All time spent by an employee performing an activity for the benefit of an agency and under the control or direction of the agency is "hours of work." Such time includes:

. . . .

to the "[s]trong public policy" considerations favoring employment rights under FLSA, "courts have consistently declined to enforce any CBA or employment contract that purports to reduce, constrain or restrict an employee's right to overtime compensation under the FLSA." *Id.* at 8–10 (citing *Martino v. Mich. Window Cleaning Co.*, 327 U.S. 173, 177–78, 66 S.Ct. 379, 90 L.Ed. 603 (1946) (notwithstanding a CBA provision requiring a forty-four hour work week before paying employees overtime, Court found employees were entitled to overtime compensation for all time worked in excess of forty hours per week); *Walling v. Harnischfeger Corp.*, 325 U.S. 427, 432, 65 S.Ct. 1246, 89 L.Ed. 1711 (1945) (determining that the regular rate of pay for incentive workers includes the guaranteed basic hourly rate plus the incentive bonuses and requiring an overtime pay computation at that rate even though the CBA provided otherwise)).

There are two major sources of interpretive principles applicable to collective bargaining agreements (CBAs) between workers and the federal government: first, traditional principles of contract interpretation, *e.g.*, *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340 (Fed.Cir.2000) ("[B]egin[ning] with the plain language[,] ... give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning ... [and] interpret the contract in a manner that gives meaning to all of its provisions.") (citations and internal quotations omitted); *UAW Local 134 v. Yard–Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) ("Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements.") and, second, federal labor law principles, *e.g.*, *O'Connor,* 308 F.3d at 1239–44 (construing a public sector CBA consistent with congressional intent underlying the Civil Service Reform Act (CSRA), 5 U.S.C. §§ 7101–7135 (2000)); *Yard–Man,* 716 F.2d at 1479 (noting that the "enforcement and interpretation of [CBAs] ... is governed by substantive federal law" and construing the intent of parties to a collective bargaining agreement consistently with federal labor policy).[9]

While the Federal Circuit in *O'Connor* did address the issue of whether a union has authority to represent federal employees, the case does not stand for the proposition that, as part of the collective bargaining process, a union may waive FLSA rights prospectively, the proposition for which defendant relies on it here. The dispute in *O'Connor* did not involve the terms of the collective bargaining agreement itself but rather the terms of the settlement agreement executed during litigation by the parties subject to the collective bargaining agreement. *See* 308 F.3d at 1237–39. The facts in that case are therefore significantly distinguishable from the facts of this case. Defendant simply does not address relevant distinctions in its briefing.

In *O'Connor,* a federal collective bargaining agreement contained broad grievance procedures for "complaints based upon the interpretation or application of any law" relating to "matters affecting conditions of employment." 308 F.3d at 1237 (internal quotations omitted). The collective bargaining agreement provided that the grievance procedures would be the exclusive procedures for resolution of complaints and did not list FLSA overtime claims among the " 'Matters Excluded' " from the grievance procedures. *Id.* The union filed grievances against the agency-employer alleging FLSA violations for failure to pay overtime as required by § 207. *Id.* Subsequently, "the parties entered into a global settlement agreement ... resolving the ... grievances against the agency" in the form of employee payments expressly representing "all backpay, interest,

(2) Time during which an employee is suffered or permitted to work[.]

5 C.F.R. § 551.401(a)(2).

9. The court in *Yard–Man* advised:

[T]he court should review the interpretations ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the [CBA] should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

716 F.2d at 1479.

liquidated damages and attorneys' fees and costs ... incurred in the [u]nion grievances." *Id.* at 1237–38 (internal quotations omitted).

Nearly a year after accepting the global settlement, individual employee plaintiffs filed suit in the Court of Federal Claims alleging FLSA overtime violations. *See id.* at 1238. The trial court concluded that it lacked subject matter jurisdiction over the *O'Connor* plaintiffs' complaint because the "overall purpose" of the CSRA was to "limit[ ] judicial remedies in favor of bargained-for grievance procedures." *Id.* at 1238. The Federal Circuit reversed, holding that the CSRA did not preclude judicial review of plaintiffs' FLSA claims. *Id.* at 1236–37 (noting that the amended CSRA requires grievance procedures to be included in all CBAs as the "exclusive *administrative* procedures for resolving grievances which fall within [federal sector CBA] coverage" (internal quotations omitted)). The *O'Connor* court applied the concurrent holding in *Mudge v. United States,* 308 F.3d 1220 (Fed.Cir.2002), that the CSRA limits federal employees' administrative grievances to the procedures set out in their CBA but does not restrict their right to seek judicial remedies for such grievances: "Congress expanded the scope of [a unionized federal] employee's rights [in 1994 amendments to the CSRA that] ... allowed federal employees to seek redress of their grievances in court and therefore outside the corners of their [CBA]." *Id.* at 1244 (citing *Mudge,* 308 F.3d at 1224–25). *O'Connor* held that FLSA rights are justiciable regardless of the provisions of a CBA.

*O'Connor* ultimately considers the narrow question of "whether a federal employee who, pursuant to the CSRA, is represented exclusively by a union and subject to a CBA, may legitimately *relinquish* his or her FLSA rights *as part of an accord and satisfaction.*" [10] *Id.* at 1242 (emphases added). The Federal Circuit held that "a settlement agreement negotiated pursuant to the CSRA and a CBA" and made in the *administrative* grievance context constituted a valid accord and satisfaction. *Id.* at 1244; *see also id.* at 1241 ("We conclude that the parties' settlement agreement constitutes a valid accord and satisfaction."). In so deciding, the Federal Circuit considered the labor policy carried out through the FLSA and the CSRA:

> [T]he congressional intent behind the FLSA, namely to protect private employees from the harmful effects of unequal bargaining power ... is not a factor here [in the federal labor context], because it was precisely this disparity in bargaining power that Congress sought to rectify through passage of the CSRA ....
>
> ....
>
> ... [T]he policy concerns [behind the FLSA] are not present in the context of a settlement agreement negotiated pursuant to the CSRA and a CBA. To the contrary, the CSRA encourages federal employees to participate in labor unions in order to avoid exactly the sort of unjust arrangements experienced by [private sector] employees by attaining an equal bargaining power vis-à-vis their employers.

*Id.* at 1243–44 (internal citations omitted).

*O'Connor* distinguishes private sector cases cited by the plaintiffs that did not "involve[ ] a settlement executed between an employer and employee as the result of a bona fide dispute as to the coverage of the FLSA." *Id.* at 1242; *see also id.* at 1243 ("Moreover, [these private sector cases did not] involve[ ] the CSRA or any other similar comprehensive statute addressing labor-management relations."). *O'Connor* also observes that, "although waivers of FLSA rights are generally invalid in the private sector," private employees may relinquish their FLSA rights by accepting settlements

10. The doctrine of accord and satisfaction operates to discharge a claim when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of [the] claim." *O'Connor,* 308 F.3d at 1240 (quoting *Case, Inc. v. United States,* 88 F.3d 1004, 1011 n. 7 (Fed.Cir.1996)) (internal quotations omitted). An accord and satisfaction generally takes the form of "a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute." *Id.* at 1240 (quoting *Nev. Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d 73, 76 (10th Cir.1949)) (internal quotations omitted).

under agency or judicial supervision. *Id.* at 1242 (citing *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1352–53 (11th Cir. 1982)) (recognizing the two ways in which claims under FLSA can be compromised by employees: by employer payments authorized by the Secretary of the Department of Labor or by an employee lawsuit against the employer for the claimed pay) and 29 U.S.C. § 216(b) (making an employer who violates the overtime provisions of FLSA liable to pay the affected employees their "unpaid overtime compensation ... and ... an additional equal amount [of the unpaid overtime compensation] as liquidated damages").

Numerous courts have considered the legality of waivers with respect to both the right to a federal judicial forum and the substantive rights themselves. In *Wright v. Universal Maritime Service Corporation,* 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), the Supreme Court unanimously held "that the right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a CBA" and that waivers of statutory rights "must be clear and unmistakable," *id.* at 80, 119 S.Ct. 391, but left open "the question whether such a waiver would be enforceable," *id.* at 82, 119 S.Ct. 391; *see also id.* ("[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.'") (quoting *Metro. Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983)) (internal quotations omitted); *Rogers v. N.Y. Univ.,* 220 F.3d 73, 76 (2d Cir.2000) (noting that an arbitration clause specifically requiring employees to submit all federal statutory claims to arbitration would be a "clear and unmistakable" waiver of judicial remedies).

*Wright* found that a general arbitration clause in a CBA between private parties did not waive individual employees' rights to a federal judicial forum for alleging employer violation of the Americans with Disabilities Act. *See* 525 U.S. at 82, 119 S.Ct. 391. The clause at issue-"this Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment"-and the parties' expressed intent "that

no provision or part of this Agreement shall be violative of any Federal or State law" were insufficient to make "compliance with the ADA a contractual commitment." *Id.* at 81, 119 S.Ct. 391 (internal quotations and citations omitted); *see also id.* at 82, 119 S.Ct. 391 ("We hold that the [CBA] in this case does not contain a *clear and unmistakable* waiver of the covered employees' rights to a judicial forum for federal claims of employment discrimination.") (emphasis added).

*Wright* emphasizes that federal statutory rights to judicial review are paramount in the context of CBA interpretation:

> The dispute in the present case ... ultimately concerns not the application or interpretation of any CBA, but the meaning of a federal statute. The cause of action [plaintiff] asserts arises not out of contract, but out of the ADA, and is distinct from any right conferred by the [CBA].... [E]ven if [plaintiff had violated the CBA] he would *still* prevail if [defendants' actions] violated [federal law].
>
> ....
>
> ... Even if [the CBA incorporated the federal statute by reference] the ultimate question ... would be not what the parties had agreed to, but what federal law requires.

*Id.* at 78–79, 119 S.Ct. 391 (refusing to presume that issues of federal statutory interpretation are governed by the terms of a CBA); *see also id.* at 76, 119 S.Ct. 391 (quoting *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 49–50, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), and distinguishing contract rights, which could be vindicated through grievance procedures, from "independent statutory rights accorded by Congress," which could not be prospectively waived by private sector unions in a CBA) (internal quotations omitted); *Gardner–Denver,* 415 U.S. at 51, 94 S.Ct. 1011 ("[T]here can be no prospective waiver of an employee's rights under Title VII [of the Civil Rights Act of 1964]."); *Barrentine,* 450 U.S. at 745–46, 101 S.Ct. 1437 (following the holding of *Gardner–Denver* in construing the effect of a CBA on private employee claims under the FLSA and holding that the CBA at issue did not waive plaintiffs' statutory rights). *But cf. Wright,*

525 U.S. at 76–77, 119 S.Ct. 391 (discussing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 35, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), allowing an individual employee to waive his right to pursue an age discrimination claim, based on the ground that "federal forum rights ... can be waived in *individually* executed contracts") (emphasis added).

While *Wright* left unresolved "the question of the validity of a union-negotiated waiver" of federal forum rights, *id.* at 77, 119 S.Ct. 391, subsequent authorities have established that, in the absence of congressional intent to permit such a waiver, unions may not prospectively waive statutory rights on behalf of employees. *See, e.g., Air Line Pilots Ass'n Int'l v. Northwest Airlines, Inc.,* 199 F.3d 477, 485–86 (D.C.Cir.1999), *judgment reinstated,* 211 F.3d 1312 (D.C.Cir.2000) (en banc) ("[T]he statutory right 'can form no part of the collective bargaining process.'") (quoting *Gardner–Denver,* 415 U.S. at 51, 94 S.Ct. 1011); *Bratten v. SSI Servs., Inc.,* 185 F.3d 625, 630–32 (6th Cir.1999); *Albertson's Inc. v. United Food & Commercial Workers Union,* 157 F.3d 758, 760–62 (9th Cir.1998); *Brisentine v. Stone & Webster Eng'g Corp.,* 117 F.3d 519, 522–27 (11th Cir.1997). The Court of Appeals for the District of Columbia distinguished between prospective waivers made by individual employees, which are permissible, and those made by a union on behalf of individual employees, which are not permissible: "Unless the Congress has precluded his doing so, an individual may prospectively waive his own statutory right to a judicial forum, but his union may not prospectively waive that right for him." *Air Line Pilots Ass'n,* 199 F.3d at 484.

As distinct from the procedural right to a judicial forum, the *substantive* rights granted individual employees under the FLSA are not, as defendant argues, Def.'s Reply CBA Br. at 4, waivable. In *Barrentine,* after exhausting their administrative remedies, employee truck drivers brought FLSA claims seeking overtime pay for uncompensated pre-trip safety inspections required by their CBA. 450 U.S. at 730–31, 101 S.Ct. 1437. The Court concluded that "the FLSA rights petitioners seek to assert in this action are independent of the collective-bargaining pro-

cess. They devolve on petitioners as individual workers, not as members of a collective organization. They are not waivable." *Id.* at 745, 101 S.Ct. 1437.

*Barrentine* distinguishes the waivability of procedural rights guaranteed by federal statutes from the non-waivability of substantive rights guaranteed by federal statutes:

> The principal congressional purpose in enacting the [FLSA] was to protect all covered workers from substandard wages and oppressive working hours .... [T]he FLSA was designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive "a fair day's pay for a fair day's work" and would be protected from "the evil of 'overwork' as well as 'underpay.'"

450 U.S. at 739, 101 S.Ct. 1437 (quoting *Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572, 578, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942)). The Court observed that its

> decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act ... [and] have held that FLSA rights cannot be abridged by contract or otherwise waived because this would "nullify the purposes" of the statute and thwart the legislative policies it was designed to effectuate. Moreover, we have held that congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement.

*Id.* at 740–41, 101 S.Ct. 1437 (quoting *Brooklyn Sav. Bank,* 324 U.S. at 707, 65 S.Ct. 895) (citations and footnotes omitted).

Article 2 of the National Agreement in this case, which specifically addresses the "Effect of Law and Regulation," Def.'s CBA Br.App. at 17 (Art. 2 of the National Agreement), contemplates that employment rights established by law are part of the parties' employment agreement. As set forth in Article 2, the parties to the National Agreement are subject to "[e]xisting or future laws," existing government-wide rules and regulations, and

future rules and regulations "not in conflict" with the National Agreement:

> [B]y this Agreement, the parties are governed by:
>
> A. Existing or future laws;
>
> B. Government-wide rules or regulations in effect upon the effective date of the Agreement;
>
> C. Government-wide rules or regulations issued after the effective date of th[e] Agreement not in conflict with th[e] Agreement; and
>
> D. Department of the Treasury or Service rules and regulations not in conflict with th[e] Agreement.

*Id.* (Art. 2, § 1 of the National Agreement).

In the regulations implementing FLSA, *see* note 8 *supra*, the Office of Personnel Management has stated that *"[a]ll time spent* by an employee performing an activity for the benefit of an agency and under the control or direction of the agency is 'hours of work' [compensable under the Act]. Such time includes[ ] ... [t]ime during which an employee is suffered or permitted to work." 5 C.F.R. § 551.401(a)(2) (emphasis added). This government-wide regulation was in effect at the time of the execution of the National Agreement in 1996, and Article 2 of the National Agreement makes clear that the parties are subject to its terms. The plain meaning of Article 2 of the National Agreement clearly supports plaintiffs' position that Section 15 of Article 22 of the National Agreement cannot be applied to avoid paying overtime compensation to CEOs for the time during which the CEOs were "suffered or permitted to work" because doing so would contravene an "[e]xisting ... government-wide ... regulation[ ]" by which the parties to this National Agreement are governed.

Even assuming, arguendo, that plaintiffs' prospective rights to overtime compensation under the FLSA could have been waived during the collective bargaining process, the court must determine whether plaintiffs unmistakably waived their rights.

Again, Section 15 of Article 22 of the National Agreement provides:

> Employees who are classified non-exempt under the Fair Labor Standards Act may not perform work outside normal working hours unless specifically ordered or authorized by the Employer to do so.

Def.'s CBA Br.App. at 206 (Art. 22, § 15 of the National Agreement).[11]

Defendant argues that, "[f]or employees that are non-exempt from the FLSA, Customs and the union bargaining for those employees expressly agreed in a binding collective bargaining agreement that those employees would not work outside of normal duty hours 'unless specifically ordered or authorized by the Employer to do so.'" Def.'s Supp. CBA Br. at 3 (quoting Art. 22, § 15 of the National Agreement). It is defendant's position that the provision "means canine enforcement officers cannot recover overtime compensation for any activity that is suffered or permitted." Def.'s Reply CBA Br. at 12. While noting that the Federal Circuit in *O'Connor* "does not impose th[e] requirement" that a FLSA waiver must be clear, Def.'s Supp. CBA Br. at 3 n.2, defendant contends that "[t]he union's waiver is clear," *id.* at 3 (footnote omitted); *see also* Def.'s Reply CBA Br. at 12 (urging that because the . provision "identifies the Fair Labor Standards Act explicitly," it constitutes a "definite" waiver). Defendant asserts that "[b]y specifying that members of the union will work only when specifically ordered, the contract necessarily excludes 'working' at other times." Def.'s Supp. CBA Br. at 4 (citing *United Pac. Ins. Co. v. United States,* · 204 Ct.Cl. 686, 497 F.2d 1402, 1405 (Ct.Cl.1975) (applying the doctrine of *"expressio unius est exclusio alterius,"* the court found that contract language specifically requiring one thing "manifested an intention" not to require something else)); *see also* Def.'s Reply CBA Br. at 12

---

11. A portion of plaintiffs' briefing appears to argue that Section 15 applies only to non-exempt employees and therefore does not apply to them because they were classified as exempt employees on the agency's form paperwork. *See* Pls.' Supp. CBA Br. at 13–14. The court does not understand plaintiffs to argue that they are in fact exempt, only that defendant's treatment of plaintiffs is inconsistent and that, if defendant were consistent, defendant could not argue that Section 15 applies to plaintiffs. Defendant may, of course, argue alternative theories.

(reasoning that by specifying "when over-time activities are compensable (when they are 'specifically ordered or authorized')[, the National Agreement] necessarily defines when overtime activities are not compensable (all other times)").

NTEU contends that this provision "does not constitute a clear and unmistakable waiver of the CEOs' right under the FLSA to receive compensation for all suffered or permitted work ... [because] [o]n its face, th[e] provision does not *explicitly* prohibit employees from seeking compensation under the FLSA for overtime work that is not 'specifically ordered or approved.'" NTEU CBA Br. at 18 (citing *Ahrens v. United States,* 62 Fed.Cl. 664, 669 (2004)) (noting that contract interpretation first requires a "study [of] the plain meaning of the contract"); *see also* NTEU Reply CBA Br. at 4 (asserting that the National Agreement provision does not "*explicitly* bar plaintiffs from recovery under FLSA").

Alternatively, NTEU argues that plaintiffs may be able to show, in fact, that "some or all of the overtime work they claim *was* 'specifically ordered or authorized.'" NTEU CBA Br. at 23. In the absence of a definition in the National Agreement, NTEU looks to the dictionary to determine the plain meaning of the terms in the phrase "specifically ordered or authorized," and argues that the phrase "refers to any work that is particularly or explicitly commanded, directed, instructed, approved, or sanctioned." *Id.* (citing Black's Law Dictionary 129, 1123, 1406 (7th ed.1999)) (internal quotations omitted). NTEU asserts that plaintiffs performed work in accordance with the agency's particular requirements for CEOs and thereby performed specifically authorized work. *See id.* at 23–24. Because section 15 of Article 22 of the National Agreement specifically refers to the payment of overtime to non-exempt employees under the FLSA, NTEU argues that the language "specifically ordered or approved" in the Section 15 overtime provision of the National Agreement is distinguishable from the language "officially ordered or approved" in the overtime provision of the Federal Employees Pay Act (FEPA), *see* 5 U.S.C. § 5542(a) (2000 & Supp. II

2002), or the language "officially assigned" in the overtime provision of the Customs Officers Pay Reform Act (COPRA) work, *see* 19 U.S.C. § 267(a)(1) (2000), on which defendant relies. *See* NTEU CBA Br. at 24; NTEU Reply CBA Br. at 8. NTEU asserts and defendant acknowledges that only the FLSA requires pay for work that is suffered or permitted. *See* NTEU CBA Br. at 24; Def.'s Reply CBA Br. at 14.

It is possible, as NTEU contends, to find that "specifically ordered or approved" work includes work that is suffered or permitted to be performed provided that the work is in accordance with an agency order, directive, policy or manual specifying certain work to be performed by CEOs. This interpretation harmonizes the various provisions of the National Agreement, particularly Section 1 of Article 2 of the National Agreement (addressing the effect of existing laws on the National Agreement) and Section 15 of Article 22 of the National Agreement (prohibiting the performance of work not specifically ordered or approved), while giving meaning to each provision.

In this case, however, not only does the language of Section 15 of Article 22 constitute, at most, a "less-than-explicit union waiver" in the National Agreement, *see Wright,* 525 U.S. at 80, 119 S.Ct. 391, the applicable case law underscores the labor law policy that substantive rights afforded employees under the FLSA are not prospectively waivable in any event. *See Barrentine,* 450 U.S. at 745, 101 S.Ct. 1437. The principal defect in defendant's claim of waiver is that the subject of waiver is not addressed or even adverted to in Section 15. This conclusion does not mean, as defendant argues, that Section 15 is "meaningless." Def.'s Reply CBA Br. at 14. Section 15 provides a basis upon which defendant could have ordered plaintiffs not to perform such work, as it appeared from pre-trial filings that Customs did in mid–2004, several years after the commencement of this suit. *See* Plaintiffs' Memorandum of Contentions of Fact and Law, filed March 15, 2005, at 7 n.1 (referring to the June 4, 2004 directive issued by the Executive Director for Border Security and Facilitation in the Office of Field Operations

instructing Port Directors "to ensure that CEOs no longer perform[ ] the unpaid, off-the-clock overtime work at issue in this case"); Def.'s Memorandum of Contentions of Fact and Law, filed April 6, 2005, at 17 (noting implementation of national directive on July 10, 2004). For these reasons, the court determines that the prohibition on the performance of work in Section 15 of Article 22 of the National Agreement, providing only that "[e]mployees ... may not perform work ... unless specifically ordered or authorized," does not constitute a clear and unmistakable waiver of the FLSA rights that plaintiffs assert here.

Finally, defendant argues that, if any ambiguity exists in section 15 (which the court does not find), the past practice of the parties may inform the court of the parties' "intent and understanding during the time prior to the filing of [the] lawsuit ... regarding the interpretation of [the disputed National Agreement] provision." Def.'s Supp. CBA Br. at 5 (citing *Dept. of Justice, Fed. Bureau of Prisons, Fed. Corr. Inst., Florence, Colo. & AFGE Local 1300*, 59 F.L.R.A. No. 32, 2003 WL 22250523 (2003)) (when interpreting a CBA, "any alleged past practices relevant to the interpretation of the agreement" may be considered). Defendant contends that "[p]laintiffs themselves have characterized the failure of the agency to compensate canine enforcement officers for alleged 'work' performed outside of normal working hours as [a] practice that has existed for decades." *Id.* at 5–6 (citing Plaintiffs' Memorandum of Fact and Law, filed March 15, 2005, at 3–5). Defendant asserts that "[t]his past practice demonstrates that the agency and the employees, and the union representing them, have understood the collective bargaining agreement to prohibit compensation for working outside of normal working hours without being specifically ordered or authorized by a supervisor to do so." *Id.* at 6.

NTEU acknowledges that Section 15 of Article 22 of the National Agreement is "completely silent as to how employees will be compensated in situations such as the one alleged here, where [the agency] *caused* the plaintiffs to perform work that is not 'specifically ordered or authorized.'" NTEU CBA Br. at 18. NTEU asserts, however, that defendant cannot avoid liability for overtime pay under FLSA. *Id.* at 20. NTEU contends that defendant is not relieved of its obligation under the Act to pay employees for work suffered or permitted by the agency "by merely adopting a rule that purports to prohibit unauthorized overtime work" because the law requires the employing agency to "exercis[e] appropriate controls to assure that only the work for which it intends to make payment is performed." *Id.* (quoting 5 C.F.R. § 551.402(a) (OPM regulation addressing the responsibility of an employer-agency in connection with FLSA and placing on the agency the responsibility "for exercising appropriate controls to assure that only that work for which it intends to make payment is performed.")).

The court believes that the dispute raises the same issues as the dispute addressed in *In re Food Lion Effective Scheduling Litigation*, 861 F.Supp. 1263 (E.D.N.C.1994), *aff'd sub nom, In re Food Lion*, 151 F.3d 1029 (4th Cir.1998) (*Food Lion*). "Despite the fact that the [National Agreement] creates clear guidelines for assigning overtime work, [Customs] nonetheless induced or expected plaintiffs to perform work that was not 'specifically ordered or authorized.'" NTEU CBA Br. at 22 (comparing the facts of this case to the facts of *Food Lion* and *Reich v. Department of Conservation & Natural Resources, Alabama*, 28 F.3d 1076 (11th Cir. 1994)).

In *Food Lion*, the Department of Labor investigated an employer's off-the-clock work practice in 1991 and 1992 and found substantial violations notwithstanding a 1989 national compliance agreement between the employer and the Department of Labor in which the employer "stipulated that it ... would not permit further off-the-clock work" 861 F.Supp. at 1267–68. The employer executed a settlement agreement with the Department of Labor, and a trial was held on the claims of those employees who opted out of the settlement. *Id.* at 1268. At trial, plaintiffs were required to show that their employer had breached its duty under 29 C.F.R. § 785.13 (2004), to stop any practice of off-the-clock work of which the employer had knowledge. *See id.* at 1272. That regulatory provision is analogous to the regulatory

provision applicable in this case. *Compare* 29 C.F.R. § 785.13 (Department of Labor regulation imposing duty on the management "to exercise its control and see that the work is not performed if it does not want it to be performed" and not to "accept the benefits [of suffered or permitted work] without compensating for them") *with* 5 C.F.R. § 551.402(a) (OPM regulation placing responsibility on the agency "for exercising appropriate controls to assure that only that work for which it intends to make payment is performed"). Although the *Food Lion* plaintiffs failed to produce sufficient evidence to establish, as a matter of law, "a pattern or practice of acquiescence by [the employer] to off-the-clock work," 861 F.Supp. at 1274, two plaintiffs did prove that they worked uncompensated overtime with the acquiescence of their supervisors to meet the employer's expectations of "Effective Scheduling," *see id.* at 1266, 1274–75.

*Reich* involved an action brought by the Secretary of the Department of Labor against the Law Enforcement Section of Alabama's Game and Fish Division of the Department of Conservation and Natural Resources for uncompensated overtime work performed by the law enforcement officers. 28 F.3d at 1078. On appeal of the district court's finding that the agency had no constructive knowledge of the overtime work performed by the law enforcement officers, the Eleventh Circuit determined that, notwithstanding the "no overtime policy" of the Department, *see id.* at 1079, there was "no indication in the record that the Department did anything at any time relevant to th[e] litigation to discourage the overtime required by the vast majority of its officers to properly perform their duties other than to promulgate [a] policy against such work and to urge the officers to 'work their best 40.'" *Id.* at 1083. Because "[t]he Department had an obligation to 'exercise its control and see that the work [was] not performed if it [did] not want it be performed,'" *id.* (quoting 29 C.F.R. § 785.13) (2004) (alterations in original), the court "conclud[ed] that the district court erred as a matter of law by finding that the promulgation of the forty-hour policy, coupled with the ability of some officers to comply, insulated the Department from liability," *id.*

The court is unpersuaded that plaintiffs' alleged performance of work for a period of time without receiving overtime pay "demonstrates" an understanding, as defendant asserts, that the National Agreement expressly prohibits overtime work for which plaintiffs seek compensation here. What the past practice does indicate, however, is a custom of employees performing uncompensated overtime work with the apparent knowledge of the agency. Notwithstanding the guidelines in the National Agreement for "assign[ing]" overtime work, *see* Def.'s CBA Br. App. at 203 (Art. 22, § 1.A of the National Agreement) (stating that employees working "assigned" overtime "will be compensated in accordance with applicable laws"), and the prohibition against "work[ing] outside normal working hours unless specifically ordered or authorized," *see id.* at 206 (Art. 22, § 15 of the National Agreement), Customs appears to have suffered or permitted plaintiffs to perform work without pay for some length of time. Acting in contravention of 5 C.F.R. § 551.402(a), a "[g]overnment-wide ... regulation[] in effect upon the effective date of the [National Agreement]," *see* Def.'s CBA Br.App. at 17 (Art. 2, § 1 of the National Agreement), the agency does not appear to have "*exercis[ed] ... controls* to assure that only that work for which it intends to make payment is performed," 5 C.F.R. § 551.402(a) (emphasis added). Although defendant attempts to distinguish the *Food Lion* and *Reich* cases to which NTEU cites, *see* Def.'s Reply CBA Br. at 16–17, defendant neither addresses nor disputes the regulatory burden imposed upon the agency by 5 C.F.R. § 551.402(a).

### III. Conclusion

For the foregoing reasons, the court concludes that the terms of the National Agreement do not relieve the agency of liability to plaintiffs who seek compensation for performing work outside of normal duty hours when Customs suffered or permitted the performance of that work.

IT IS SO ORDERED.